**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| ANGELA DOWDELL,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>ADMINISTRATION,<br><br>　　　　　Defendant. | CASE NO. 1:22-CV-01348-JRA<br><br>DISTRICT JUDGE  JOHN R. ADAMS<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Angela Dowdell ("Plaintiff" or "Ms. Dowdell") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.    Procedural History

On March 12, 2020, Ms. Martin filed applications for DIB and SSI.  (Tr. 130-31.)  She alleged a disability onset date of August 20, 2014.  (*Id.*)  She alleged disability due to Grange Occlusive Arterial Syndrome, mesenteric artery stenosis, cerebral aneurism, unruptured, bilateral carotid artery occlusion, mesenteric ischemia, visual disturbances, osteoporosis, memory issues, prior TIA, anxiety, and fatigue.  (Tr. 58.)  Ms. Dowdell's applications were denied at the initial

1

level (Tr. 73-76) and upon reconsideration (Tr. 79-82), and she requested a hearing (Tr. 83).  On March 25, 2021, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 35-56.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Dowdell was born in 1988 and was 26 years old on the alleged disability onset date, making her a younger individual under Social Security regulations.  (Tr. 28, 130, 143.)  She had at least a high school education.  (Tr. 28.)  Ms. Dowdell had not worked since August 20, 2014, the alleged onset date.  (Tr. 15.)

### B.     Medical Evidence

#### 1.     Relevant Treatment History

Prior to the period under consideration, on August 24, 2010, Ms. Dowdell met with geneticist Marvin Natowicz, M.D., Ph.D., on referral for genetic and metabolic diagnostic consultation.  (Tr. 352.)  After extensive testing, Dr. Natowicz concluded the best diagnostic fit for Ms. Dowdell's clinical history, exam, biopsy, and imaging findings was a rare syndrome, Grange syndrome.  (Tr. 363.)  Other members of Ms. Dowdell's family also have Grange syndrome, which is characterized by arterial stenoses affecting multiple large and medium-sized vessels, syndactyly, and osteoporosis.  (*Id.*)  Dr. Natowicz noted Ms. Dowdell was regularly evaluated by vascular medicine specialists, and recommended she restart evaluation by cerebrovascular medicine due to her bilateral ICA stenoses and a history of blacking out.  (Tr. 364.)  Dr. Natowicz also recommended periodic consultation with a renal medicine specialist because of her longstanding history of renovascular hypertension and bilateral renal artery stenoses.  (*Id.*)  Ms. Dowdell's DEXA scans were normal, but she had earlier X-rays that revealed osteopenia.  (*Id.*)  She and Dr. Natowicz discussed following with a bone/mineral

2

specialist. (*Id.*) Dr. Natowicz determined that additional genetic diagnostic testing was unnecessary because it would not affect her immediate clinical care and she did not have health insurance coverage at the time. (*Id.*)

On January 8, 2013, bilateral renal artery angiograms revealed bilateral stenosis on the right mid artery and left proximal renal artery; bilateral angioplasties were performed and no residual stenosis was detected. (Tr. 305-07.) At a follow-up appointment with vascular surgeon Rebecca Kelso, M.D., on February 22, 2013, Ms. Dowdell was noted to be doing better, with stable weight but continued pains one to two times per week, lasting a few hours when they occurred. (Tr. 300-01.) Dr. Kelso noted Ms. Dowdell's history of bilateral internal carotid artery occlusions, her left renal angioplasty in May of 2006, and the placement of ICAST stents in July 2007 after the angioplasty developed aneurysmal degeneration. (Tr. 301.) Dr. Kelso diagnosed occluded SMA bypass with multivessel involvement, including carotids and renals, and noted that an ultrasound revealed improved renal velocities. (*Id.*) Ms. Dowdell's blood pressure was minimally elevated, but this was suspected to be the result of forgetting her medication that day. (*Id.*) Dr. Kelso recommended that she return in six months for an ultrasound and in one year for a carotid study. (*Id.*) Dr. Kelso also discussed with Ms. Dowdell the recommendation of her OB that she have no further pregnancies, recommending a second opinion for information and peace of mind. (*Id.*)

On August 18, 2014, Ms. Dowdell presented to Akron Children's Hospital with acute abdominal pain, in her third trimester of pregnancy, and was admitted to the Akron City Hospital. (Tr. 204.) She underwent a repeat low transverse cesarean section on August 20, 2014, due to chronic hypertension with superimposed preeclampsia with severe features. (Tr. 230-32.) She then underwent an exploratory laparotomy, lysis of adhesions, and right

3

hemicolectomy on August 22, 2014, prompted by a postpartum abdominal CT scan suggesting pneumatosis of the distal ileum and ascending colon, concerning for intestinal necrosis.  (Tr. 228-29.)  Elizabeth Bender, M.D., diagnosed transmural necrosis of the distal ileum and right ascending colon, with no evidence of laceration, and small 1-2 cm dehiscence of the cesarean section site.  (Tr. 228.)  Dr. Bender performed a second-look laparotomy with stapled side-to-side ileocolonic anastomosis, diverting ileostomy, and open cholecystectomy on August 23, 2014.  (Tr. 225-26.)  No new areas of ischemia were noted; the diagnosis was ischemic cholecystitis.  (Tr. 225.)  Ms. Dowdell developed a left groin swelling secondary to a possible hematoma and postoperative ileus.  (Tr. 204.)  She also had hyponatremia, which was treated by IV fluids.  (*Id.*)  She clinically improved and was discharged from the hospital on September 2, 2014.  (*Id.*)  Her discharge diagnoses were acute abdominal pain, status post exploratory laparotomy with ileostomy, and cholecystectomy.  (*Id.*)

Ms. Dowdell returned to Akron City Hospital on September 5, 2014, complaining of abdominal pain, poor oral intake, transient confusion, and likely dehydration.  (Tr. 237-38.)  She was admitted for dehydration and hyponatremia.  (Tr. 237.)  Dr. Bender evaluated her, did not see objective evidence of ongoing ischemia, and did not feel there was an acute surgical issue. (Tr. 237, 248.)  A mesenteric duplex exam on September 6, 2014 reflected possible occlusion of the superior mesenteric artery.  (Tr. 247.)  A neurological workup was recommended, and Ms. Dowdell was approved for transfer to the Cleveland Clinic to complete a neurological workup and further evaluate her epigastric abdominal pain on September 7, 2014.  (Tr. 237.)  Her discharge diagnoses included: hyponatremia secondary to hypokalemia, resolved with fluids; transient dysarthria, questionable transient ischemic attack ("TIA"); history of Grange syndrome

with multiple vascular effects; recent right hemicolectomy secondary to ischemic bowel with ileostomy; and status post recent cesarean section.  (Tr. 237-38.)

Ms. Dowdell was admitted to the Cleveland Clinic from September 7 through September 13, 2014.  (Tr. 1320-22.)  Sameh Talaat Demian, M.D., observed that her mesentric angiogram showed no significant changes compared to prior study from April 9, 2014.  (Tr. 1320.)  He also noted that the reported 60-99% stenosis in her right renal artery may have been overestimated. (*Id.*)  A CT angiogram showed: postsurgical changes with occlusion of the proximal anastomosis of the known aortic to SMA venous bypass graft; reconstitution of the SMA through prominent IMA and gastroepiploic arteries; diminutive celiac trunk origin with possible reconstitution through right epigastric branches; and the renal artery demonstrated patency without high degree stenosis bilaterally.  (*Id.*)  A carotid doppler showed patent vertebral arteries and a previously known bilateral internal carotid artery occlusion.  (*Id.*)  Ms. Dowdell's discharge diagnoses included abdominal pain, middle aortic syndrome, hypoalbuminemia, receptive aphasia, high output ileostomy, and mild malnutrition.  (*Id.*)

Before discharge, Ms. Dowdell was reviewed by the vascular team and no further intervention was indicated, except that subcutaneous Lovenox was recommended for three weeks.  (*Id.*)  She was reviewed by the surgical team for high ostomy output, which was noted to be managed with Imodium and Lomotil.  (*Id.*)  She was reviewed by the chronic GUT rehab team, who made recommendations to improve her nutrition and manage malnutrition in the context of acute illness and large/small bowel resection.  (*Id.*)  She was instructed to follow up with general surgery (to plan her ostomy reversal), with vascular surgery, and with the GUT rehab team.  (*Id.*)  She also was instructed to continue on aspirin in view of her recent receptive aphasia, suggestive of TIA, and to follow up with neurology as scheduled.  (*Id.*)

At a September 26, 2014 appointment, vascular surgeon Dr. Kelso noted Ms. Dowdell was doing better than when she was seen as an inpatient, but still reported problems with her volume output.  (Tr. 1264.)  She diagnosed occluded SMA bypass and stable abdominal disease, and recommended follow up and a repeat ultrasound in six months.  (*Id.*)  Ms. Dowdell presented to the cerebrovascular center on October 6, 2014 for evaluation of TIA.  (Tr. 1254-57.)  Her neurological examination was normal.  (Tr. 1256.)  A repeat MRI and MRA brain were ordered and she was instructed to continue with antiplatelet for secondary stroke prevention.  (*Id.*)

On October 23, 2014, Ms. Dowdell met with colorectal surgeon Scott A. Strong, M.D., for a consult regarding her ileostomy.  (Tr. 1242-47.)  She reported emptying her stoma appliance eight to ten times per day, with output measuring between 2 to 2.5 liters despite treating with Imodium, Lomotil, and opium before meals and at bedtime.  (Tr. 1243.)  She also reported changing her adhesive flange every two or three days.  (*Id.*)  Dr. Strong's impression noted high ostomy output and weight loss.  (Tr. 1242.)  He recommended considering a cycled home total parenteral nutrition ("TPN") and noted a probable takedown of the ileostomy with creation of ileocolostomy leaving mesentery intact no sooner than March 2015.  (*Id.*)  On November 3, 2014, Ms. Dowdell decided to move forward with admission for TPN.  (Tr. 1239.)

Ms. Dowdell was admitted to the Cleveland Clinic on November 10, 2014 due to severe malnutrition and the need for TPN.  (Tr. 1235.)  She continued to have high ostomy output with questionable malabsorption.  (Tr. 1222.)  The remaining length of her short bowel was unknown, and she was noted to have short gut syndrome.  (*Id.*)  She was admitted for placement of a Hickman catheter for TPN and for a transjugular liver biopsy to assess her abnormal liver function test.  (Tr. 1198.)  Liver biopsy results revealed severe macrovesicular steatosis without fibrosis, consistent with malnutrition.  (Tr. 1217, 1222.)  During her admission, she consulted

with the Center for Gut Rehabilitation and Transplantation ("CGRT"), with whom she had been treating since September 12, 2014 for management of her malabsorption.  (Tr. 1226.)  She was observed to be thin and frail, slightly pale and weak.  (*Id.*)  She had lost nearly fifteen pounds over two months, representing 15.2% of her body mass, with moderate subcutaneous muscle loss.  (Tr. 1225.)  Ms. Dowdell was recommended to have 1350-1720 calories per day, and 57-76 grams of protein.  (Tr. 1230.)  She weighed 84 pounds, with a recommended a goal weight of 104 pounds.  (*Id.*)  She was discharged from the hospital on November 14, 2014, with the principal diagnosis severe malnutrition.  (Tr. 1235.)  Upon discharge, she was instructed to continue monitoring her liver function and electrolytes for refeeding syndrome.  (Tr. 1219.)

Ms. Dowdell attended a consultation with surgeon Kareem M. Abu Elmagd, M.D., at the Center for Gut Rehabilitation and Transplant on March 31, 2015.  (Tr. 1164-68.)  She was referred by gastroenterologist Ezra Steiger, M.D., to discuss bowel reconnection.  (Tr. 1165.)  Her weight was 96 pounds and her physical examination findings were normal.  (Tr. 1166-67.)  Dr. Elmagd referred her for a cardiac consultation and preop clearance, which occurred on April 16, 2015.  (Tr. 1159-61.)  Her heart was found to be structurally normal with a mildly positive bubble study, and there were no contraindications for surgery.  (Tr. 1161.)

Ms. Dowdell attended a follow-up appointment with vascular surgeon Dr. Kelso on May 11, 2015.  (Tr. 1154-55.)  She reported that she was planning a surgical ostomy takedown on June 2, but remained primarily on TPN for nutritional supplementation.  (Tr. 1155.)  Dr. Kelso diagnosed stable abdominal disease by imaging, and recommended that Mr. Dowdell continue use of clonidine after her ostomy reversal as she would have a transition period to continued high transit / poor absorption.  (*Id.*)

Ms. Dowdell attended a pre-surgical appointment with Dr. Elmagd on May 18, 2015. (Tr. 1149-54.) Dr. Elmagd noted that she was scheduled for exploratory laparotomy on June 2, 2015, and noted that she was still TPN dependent, getting twelve hours of infusion nightly and eating small portions of food at a time. (Tr. 1150.) Her weight was 100 pounds. (Tr. 1154.)

On June 2, 2015, Ms. Dowdell was admitted to the Cleveland Clinic for takedown of her diverting loop ileostomy. (Tr. 721-22; 1136-37.) She underwent a takedown of loop ileostomy with limited small bowel resection and side-to-side enteroenteric anastomosis on that same day. (Tr. 1095.) Following surgery, she was started on Imodium, but her opium tincture and Lomotil were discontinued to better monitor her post-surgical bowel function. (Tr. 722, 1136.) She was restarted on her overnight TPN, but with plans to wean as an outpatient. (*Id*.) She was discharged on June 8, 2015, with her pain noted to be well controlled on Tylenol. (*Id*.)

She attended a follow-up appointment with Dr. Elmagd on June 25, 2015. (Tr. 1089-93.) Her weight was 103 pounds and her physical examination was normal. (Tr. 1092.) She was instructed to discontinue TPN and return on July 6, 2015 for wound assessment. (*Id.*) At her July 6, 2015 appointment (Tr. 1085-89), she was no longer on TPN (Tr. 1086). Her last PN infusion was July 2, 2015, but she had received IV fluids on July 3 and July 5, 2015. (Tr. 1088.) She was assessed with mild nutrition, and instructed to hold further PN or IV fluids. (*Id.*)

On July 24, 2015, a month after her date last insured of June 30, 2015, Ms. Dowdell met with CGRT for follow up labs and a nutritional assessment after the removal of her ileostomy. (Tr. 1077.) She had been weaning herself off TPN, and had been on a complete oral diet and without IV hydration for over two weeks. (Tr. 1077, 1079.) Her weight was 100 pounds. (Tr. 1078.) Because she was off PN and IV fluids, plans were made to remove her catheter. (Tr. 1080.) She was instructed to continue vitamin and mineral supplements, but to stop Imodium

unless experiencing diarrhea greater than five watery stools in a day.  (*Id.*)  On July 27, 2015,
Ms. Dowdell had her central venous catheter removed.  (Tr. 766.)  The procedure was successful
and she tolerated the procedure well. (Tr. 767.)  Labs obtained indicated Ms. Dowdell continued
to experience mild malnutrition.  (Tr. 768.)

Ms. Dowdell attended a follow-up appointment with Dr. Kelso on November 16, 2015.
(Tr. 1068-69.)  She told Dr. Kelso that her problems with her weight had normalized and she had
been off TPN since July, but complained of increased blood pressure, heart pounding, and
weakness.  (Tr. 1068.)  Her weight was 93 pounds.  (Tr. 1069.)  Dr. Kelso diagnosed occluded
SMA bypass and stable mesenteric disease by imaging and symptoms.  (*Id.*)  She recommended
daily blood pressure readings for two weeks.  (*Id.*)  Ms. Dowdell underwent a right renal artery
angiography with balloon angioplasty on January 5, 2016.  (Tr. 1054-55.)

Ms. Dowdell attended a post-operative visit with CGRT on January 15, 2016.  (Tr. 1051-
54.)  She reported that she was able to maintain her weight, but lost weight easily when she was
sick; her highest weight was 104 pounds.  (Tr. 1051.)  Her weight was 91 pounds at that visit,
and her physical examination was normal.  (Tr. 1053.)  Masato Fujiki, Ph.D., M.D., noted that
she was status post ileostomy closure and had lost ten pounds since surgery.  (Tr. 1054.)  She
reported contracting several viral infections from her child and said she could not eat well when
she was sick.  (*Id.*)  Otherwise, she reported that she ate "okay" and did not have diarrhea.  (*Id.*)
Dr. Fujiki referred her back to Dr. Steiger for follow-up for nutritional support.  (*Id.*)

### 2.    State Agency Reviewers

On July 2, 2020, Lynne Torello, M.D., reviewed the record at the initial level.  (Tr. 63-
64.)  Dr. Torello noted Ms. Dowdell had required TPN for eight months during the relevant
period, but that the evidence also showed she had been doing well.  (Tr. 63.)  Dr. Torello found

Ms. Dowdell could: sit and stand or walk six hours per day; lift 20 pounds occasionally and 10 pounds frequently; occasionally climb ramps/stairs and ladders/ropes/scaffolds; and occasionally stoop, crouch, or crawl.  (Tr. 63-64.)  On reconsideration on August 25, 2020, Scott Bolz, M.D., agreed with Dr. Torello and found the same limitations.  (Tr. 71.)

## C.     Hearing Testimony

### 1.     Plaintiff's Testimony

At the hearing on March 25, 2021, Ms. Dowdell testified that she had a driver's license and was able to drive locally, but did not drive at night because her night vision wasn't very good.  (Tr. 40-41.)  She also had a period of a year and a half where she was unable to drive as a side effect of medications, including an opium tincture.  (Tr. 43.)  She last worked in 2014, when she was self-employed by her father.  (Tr. 41.)  Prior to that, she worked part-time at Dairy Queen.  (*Id.*)

Ms. Dowdell explained that she had complications with her second pregnancy that caused her to have a portion of her intestines removed and an ileostomy.  (Tr. 42.)  As a further complication of that procedure, she was placed on TPN, an IV nutrition for twelve hours per day from November 2014 through June 2015.  (*Id.*)  She was unable to care for herself or her children at that time and needed to move in with her parents.  (*Id.*)  Her ileostomy was reversed in June 2015, but she reported continued symptoms from the procedure that included fatigue and needing to go to the bathroom frequently.  (*Id.*)  The fatigue was caused by low nutrition.  (Tr. 43.)  Ms. Dowdell stated she would sleep ten hours at night and still need naps during the day.  (*Id.*)  She also has headaches and vision symptoms because of blocked blood vessels in her neck and brain.  (Tr. 42.)  She reported being restricted from lifting more than 20 pounds.  (*Id.*)

During the period in question, Ms. Dowdell said she very rarely went to the grocery store, and never by herself.  (Tr. 43.)  She reported being considered medically homebound by Medicaid.  (Tr. 44.)  She had a nurse come and help her once per week to change the dressing for the central line and do a well check.  (Tr. 51.)  During that time, Ms. Dowdell was able to understand the programs on television, go up and down stairs, and bathe and dress herself.  (Tr. 44.)  She could only lift ten pounds.  (*Id.*)  She was not able to walk far, only "around the house a bit."  (*Id.*)  She could only stand for about five or ten minutes before needing to sit or lie down. (Tr. 44-45.)  She and her family had moved in with her parents during this period and her mother cooked meals for the family.  (Tr. 46-47.)  Ms. Dowdell was able to make her bed in the morning but did not do other chores.  (Tr. 47.)

A typical day consisted of a twelve-hour TPN infusion overnight, after which Ms. Dowdell would wake up and flush the TPN line.  (Tr. 45.)  She would sit and watch TV during the day.  (*Id.*)  At times, she required additional hydration and would take a saline infusion.  (*Id.*) She would prepare her next TPN infusion at around eight p.m.  (Tr. 46.)  When she was placed on the TPN infusions, she weighed only about eighty pounds.  (Tr. 50.)  She reported that she has not required TPN infusions since 2015, and that she regained some nutritional stability starting in 2018.  (Tr. 48.)

Ms. Dowdell reported needing to use the bathroom frequently during this period, as she had to empty her high-output ileostomy bag many times each day.  (Tr. 49.)  The emptying process would take ten to fifteen minutes each time.  (Tr. 50.)  She would change her ileostomy bag daily or every other day.  (Tr. 46.)  Even after the ileostomy reversal, she reported that she would be in the bathroom ten to fifteen times per day.  (Tr. 50.)  Even while on bowel slowing medications, she needed to go to the bathroom frequently.  (*Id.*)  She also required six to twelve

meals per day, depending on the day.  (Tr. 49.)  However, she also reported that the occluded

arteries supplying her stomach and intestines cause her pain if she eats frequently.  (Tr. 50.)

Ms. Dowdell testified that there is not much that her doctors can do for her vascular

condition other than periodic scans to ensure adequate blood flow.  (Tr. 47-48.)  She also

testified that she experiences Reynaud's Syndrome, which causes her extremities to become

numb, white, and painful in cool weather.  (Tr. 51.)  Her vascular condition reportedly causes

headaches most days, some of which are worse and cause her to lie down.  (Tr. 48.)  The worst

ones occur one or two days per week.  (*Id.*)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Ms. Dowdell's age,

education, and work experience with the function limitations described in the RFC determination

could not perform Ms. Dowdell's prior work, but could perform representative positions in the

national economy, including assembler, sorter, and inspector.  (Tr. 53.)  He also testified that an

employee who would be off task 10% of the work day or absent more than two days per month

would be dismissed unless they could correct the off-task behavior or absenteeism.  (Tr. 53-54.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments

depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In his September 1, 2020 decision, the ALJ made the following findings:[1]

---
[1] The ALJ's findings are summarized.

1.    The claimant last met the insured status requirements of the Social Security Act on June 30, 2015.  (Tr. 15.)

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 20, 2014 through her date last insured of June 30, 2015.  (*Id*.)

3.    Through the date last insured, the claimant has the following severe impairments: grange syndrome with arterial occlusive disease; cerebral aneurysm, unruptured; mesenteric insufficiency with malabsorption syndrome; and headaches.  (Tr. 16.)

4.    Through the date last insued, the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 15.)

5.    The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: The claimant can occasionally climb ramps and stairs. She would be precluded from climbing ladders, ropes, and scaffolds. The claimant could occasionally stoop, kneel, crouch, and crawl. She should avoid exposure to workplace hazards, including unprotected heights or dangerous, unprotected, moving, mechanical parts.  (Tr. 20.)

6.    The claimant has no past relevant work.  (Tr. 28.)

7.    The claimant was born in 1988 and was 27 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id*.)

8.    The claimant has at least a high school education.  (*Id*.)

9.    Transferability of job skills is not material to the determination of disability.  (*Id*.)

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including assembler, sorter, and inspector.  (Tr. 28-29.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from August 20, 2014, through June 30, 2015, the date last insured.  (Tr. 30.)

14

## V.     Plaintiff's Arguments

Ms. Dowdell's assignment of error is that substantial evidence did not support the ALJ's finding that her subjective complaints were inconsistent with the evidence.  (ECF Doc. 7, p. 8.)

## VI.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

15

questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## A.     Sole Assignment of Error: Whether Substantial Evidence Supports the ALJ's Findings Concerning Plaintiff's Subjective Complaints.

Ms. Dowdell argues that the ALJ's finding concerning her subjective complaints is not supported by substantial evidence because "[t]he evidence cited by the ALJ to support his finding that [Ms. Dowdell]'s complaints are not consistent with the evidence in fact proves [Ms. Dowdell]'s allegations are credible, and consistent with the evidence and underlying medical impairments."  (ECF Doc. 7, pp. 8-10.)  The Commissioner argues in response that the ALJ's decision was supported by substantial evidence because the record reflected that Ms. Dowdell's serious symptoms markedly improved within twelve months of onset.  (ECF Doc. 8, p. 6.)

Under the two-step process used to assess the limiting effects of a claimant's symptoms, the ALJ first determines whether there is an underlying medically determinable impairment that

16

could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a))*.*  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  The ALJ determined Ms. Dowdell's impairments could reasonably cause her symptomatology (Tr. 25), and therefore the discussion herein focuses on the ALJ's compliance with the second step.

Ultimately, this Court must determine whether the record contains substantial evidence to support the Commissioner's evaluation of Ms. Dowdell's subjective symptoms.  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).  As explained above, "'[t]he substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakely*, 581 F.3d at 406 (internal citation omitted).  Thus, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.

Here, a review of the decision reveals that the ALJ considered the entire record, based his findings on multiple relevant factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed Reg. 49462, 49467.

Ms. Dowdell does not argue that the ALJ failed to acknowledge her significant treatment for Grange syndrome and mesenteric insufficiency with malabsorption.  Instead, she argues the

17

ALJ's decision "does not sufficiently articulate why these facts and findings render Plaintiff's allegations not entirely consistent with the evidence." (ECF Doc. 7, p. 10.) She further contends that "the ALJ mischaracterized her allegations by failing to acknowledge or consider [her] explanation, or the difficulties she has in performing various activities" and that "the record of evidence and even portions of the ALJ's decisions corroborates [Ms. Dowdell]'s testimony concerning her allegations of functional limitations." (*Id.* at p. 15.)

Ms. Dowdell is correct that the ALJ acknowledged her Grange syndrome, her partial colonic resection with ileostomy in August 2014, her residual symptoms in September 2014, her high ileostomy output and weight loss in October 2014, and her malnutrition and abnormal liver enzymes in November 2014. (*Id.* at 11 (citing Tr. 22-23).) She argues the ALJ also noted continued malnutrition and elevated liver enzymes in March 2015, continued occluded SMA and IMA arteries in May 2015, and some gut dysmotility in June 2015. (*Id.* at pp. 11-12 (citing Tr. 23).) She acknowledges the ALJ's observation that she had her ileostomy for a "short period of time, notably less than a year" and used TPN cycling from November 2014 through July 2015 (Tr. 23), but argues this "is not a reason to detract from the veracity and consistency of [Ms. Dowdell]'s statements" because "the ALJ acknowledges that Plaintiff's symptoms remained after it was reversed." (ECF Doc. 7, p. 12.)

After outlining Ms. Dowdell's significant treatment relating to Grange syndrome, mesenteric insufficiency, partial colonic resection with ileostomy, and malnutrition, the ALJ noted that Ms. Dowdell underwent an ileostomy takedown and reversal in June 2015 and provided the following additional discussion:

> After the expiration of her date last insured, during July 2015, the claimant underwent a Hickman line removal. It should be noted the claimant was assessed with no more than mild malnutrition and in the context of chronic illness based upon weight loss, her condition was "not clinically significant."

18

Additional treatment notes after the expiration of her date last insured support the claimant was no longer seeing the intestinal clinic as she has been officially discharged. Further, she maintained a stable weight. The record also supported no recurrent mesenteric ischemia.

While the claimant evidenced ischemia and insufficiency affecting her small intestine, she only required ileostomy for a short period of time, notably less than one year. The claimant underwent the procedure in August 2014 and the procedure was successfully reversed in June 2015. Further, while she demonstrated a period of malabsorption due to her mesenteric ischemia/insufficiency, the problem was not significant in duration. The claimant evidenced need for Hickman catheter and TPN cycling from November 2014 through July 2015, at which time the Hickman line was removed and the claimant evidenced no more than mild malnutrition and clinically insignificant weight loss.

(Tr. 23 (footnote and citations omitted).)

The ALJ also acknowledged Ms. Dowdell's testimony regarding the impact of managing her TPN nutrition and changing her ileostomy bag, and the frequency with which she reportedly used the restroom after the ileostomy was reversed.  (Tr. 20-21.)  He also acknowledged medical records indicating that she was frequently emptying her ileostomy bag due to high output in October 2014.  (Tr. 23.)  However, in considering whether Ms. Dowdell's symptoms occurred with the frequency, duration, and severity alleged, the ALJ provided the following discussion:

The claimant did require 12-hour infusions at night for a period of time; however, this was from November 2014 to the beginning of July 2015 only. After that time, the claimant experienced improvement in her labs and she was weaned from the infusion therapy, noting no more than mild malnutrition. While the claimant reported she had low energy while taking infusions, her treatment for infusion therapy was less than 12 months in duration. The claimant reported needing to change her ileostomy bag multiple times per day; however, the record supports the ileostomy existed for only short duration and was reversed within 12 months of being placed. As noted above, the claimant had the device from August 2014 through June 2015. While the claimant reported recurrent frequent bowel movements, the record does not support the frequency she alleged. The claimant did not report any bowel related accidents to medical providers.

(Tr. 26.)  Thus, with respect to the limitations Ms. Dowdell described in connection with her ileostomy bag and TPN nutrition, a review of the ALJ decision reveals that he acknowledged the evidence supporting the *severity* of certain symptoms alleged by Ms. Dowdell but clearly

determined that the evidence did not show that the alleged severity lasted for the necessary *duration*.  Ms. Dowdell's argument that the ALJ acknowledged her symptoms continued after the ileostomy reversal is not consistent with the above analysis, where the ALJ noted that medical records at that time showed only mild malnutrition and clinically insignificant weight loss (Tr. 23) and did not support her allegations of frequent bowel movements (Tr. 26).

Under Social Security regulations, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last *for a continuous period of not less than 12 months*."  42 U.S.C. 423(d)(1)(A) (emphasis added).  The undersigned cannot find that the ALJ lacked substantial evidence to support his finding that the significant alleged symptoms and limitations relating to Ms. Dowdell's high-output ileostomy bag and malnutrition did not occur for the duration necessary to require a reduction of Ms. Dowdell's RFC.

Ms. Dowdell also argues that the ALJ misrepresented her functional abilities because he did not consider her testimony that her medication made it so that she could not drive.  (ECF Doc. 7, p. 14.)  In discussing the impact of Ms. Dowdell's medications, the ALJ wrote:

> [T]he claimant did not testify she experienced any significant adverse medicinal side effects to her prescribed medications. During the period under adjudication, the record was devoid of any recurrent reports of adverse/significant medicinal side effects made to treatment/medical providers. The record supports during the period under adjudication, the claimant was routinely prescribed medications and was taking medications as instructed, suggesting they continued to provide at least some medical benefit.

(Tr. 25.)  Ms. Dowdell is correct that the ALJ did not acknowledge the reported impact of the opium tincture she took during the period in which she had an ileostomy.  (ECF Doc. 7, p. 14.)  Ms. Dowdell testified during the hearing that she was on an opium tincture and didn't drive for a year and a half.  (Tr. 43.)  However, the record reflects that Ms. Dowdell was weaned off the

opium tincture within a twelve-month period, as it was discontinued in June 2015 after her ileostomy was reversed.  (Tr. 722.)  Further, there is no indication that even a limited ability to drive would have materially impacted the ALJ's decision-making regarding the RFC, which restricted Ms. Dowdell to sedentary work with no exposure to workplace hazards such as unprotected heights and moving mechanical parts.  Thus, the ALJ's failure to address the side effects of her opium tincture does not deprive his analysis of the support of substantial evidence.

Ms. Dowdell also takes issue with the ALJ's consideration of the evidence concerning her activities of daily living, pointing out her testimony that she lived with her parents and required a great deal of help during the period at issue (Tr. 42-43), that she was malnourished and this caused her to have very low energy (Tr. 43), that she rarely went to the grocery store or did other chores around the house (Tr. 43, 46-47), that she was easily fatigued (Tr. 51), and that she required the assistance of weekly nurse visits and was considered medically homebound by Medicaid (Tr. 50-51).  However, the ALJ acknowledged these allegations and provided an analysis that was consistent with his broader finding that her most significant symptoms and treatment did not last for the duration necessary to support a disability finding.  (Tr. 25-26.)  He also observed: "While the claimant reported that she applied for disability in 2020 because she felt her health was plateauing, it should be noted the period under adjudication was 2014 to 2015 after which the claimant reported her health had improved."  (Tr. 26.)

The undersigned finds the ALJ sufficiently explained his reasons for finding Ms. Dowdell's subjective allegations were not as limiting as she alleged.  The ALJ was not required to "accept [her] subjective complaints." *Jones*, 336 F.3d at 476.  Ms. Dowdell has not shown that the ALJ ignored evidence.  Instead, the record reflects that the ALJ weighed the entirety of the evidence and credited Ms. Dowdell's subjective allegations to the extent – and for the duration –

21

he found them supported by the record.  While Ms. Dowdell argues that the evidence supports a finding that the symptoms were more limiting, it is not this Court's role to "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387. The ALJ adequately considered the subjective allegations in the context of the whole record.

For the reasons set forth above, the undersigned finds Ms. Dowdell has not met her burden to demonstrate that the ALJ erred in considering her subjective complaints, and that the ALJ adequately explained his reasons for finding the subjective complaints were not entirely consistent with other evidence in the record.  Accordingly, the undersigned finds Ms. Dowdell's sole assignment of error to be without merit.

## VII.   Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

June 29, 2023

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).